**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| Giselle Landrau Fragoso; Idalis Landrau Fragoso; Ivonne Landrau Fragoso and German Landrau Fragoso on their personal behalf and as members of the state of victim decedent Maria Fragoso<br><br>Plaintiffs<br><br>v.<br><br>HOSPITAL PAVÍA DE SANTURCE, INC.; EMERGENCY PHYSICIAN PROVIDERS, LLC; PUERTO RICO MEDICAL DEFENSE INSURANCE COMPANY (PRMD); MEDPRO GROUP aka MEDPRO GROUP; DR. MOISES O. RAMIREZ VEGA; his wife Jane Doe and the conjugal partnership ABC composed by them; DR. FELIX M. GONZALEZ-SANTIAGO, his wife Jane Doe 2 and the conjugal partnership DFG composed by them; NATIONAL FIRE AND MARINE INSURANCE COMPANY; JOHN DOE, his wife JANE DOE 3, and the conjugal partnership composed by them; RICHARD ROE; UNKNOWN INDIVIDUALS A, B and C; and the conjugal partnerships HIJ, JKL, MNO, composed by them; CONTINENTAL INSURANCE COMPANY, SINDICATO DE ASEGURADORES PARA LA SUSCRIPCIÓN CONJUNTA DE SEGURO DE RESPONSABILIDAD PROFESIONAL MÉDICO-HOSPITALARIA aka SIMED; PUERTO RICO MEDICAL DEFENSE; A,B and C Insurance Companies; X,Y, and Z Insurance Companies; ABC Corp.; UNKNOWN CORPORATIONS X,Y and Z;<br><br>Defendants | CIVIL NO: 24-cv-01123<br><br><br>MALPRACTICE<br><br>EMTALA; TORTS; MEDICAL AND HOSPITAL MALPRACTICE; HOSPITAL LIABILITY;<br><br>**PLAINTIFFS DEMAND TRIAL BY JURY** |

**<u>COMPLAINT</u>**

**TO THE HONORABLE COURT:**

**COME NOW,** Plaintiffs, Giselle Landrau Fragoso, Idalis Landrau Fragoso, Ivonne Landrau Fragoso, and German Landrau Fragoso (hereinafter collectively "Landrau-Fragoso Family" and/or "The Family" and/or "Plaintiffs"), through their undersigned attorneys, and very respectfully state, allege and pray as follows:

## I.     INTRODUCTION

1.  In this suit, the Landrau-Fragoso Family seek redress for all the damages caused by those who negligently let their matriarch die, Mrs. Maria Fragoso ("Mrs. Fragoso").

2.  The legal predicates for the suit are the Emergency Medical Treatment and Labor Act ("EMTALA") as well as Puerto Rico's general tort statute.

3.  The EMTALA violations set forth in the Complaint are based without limitation on failure to screen, failure to stabilize; failure to comply with on call obligations and by not having medical personnel on time; and failure to transfer as required by the statute.

4.  The general tort claims arises from a myriad of negligent deviations from the applicable standard of medical care against all defendants including hospital, contractors, and physicians, and or its' employees and/or contractors, which are all jointly and severally liable under articles 1536, 1540, and 1541 of the Puerto Civil Code, 31 L.P.R.A. §10801, §10805and§10806.

5.  Defendants' lack of adequate care in the treatment of Ms. Fragoso and/or professional malpractice attributable to Defendants and/or Defendants' healthcare staff resulted in her intense pain and death and have caused severe mental anguish and emotional distress to Landrau-Fragoso Family, including inherited damages.

## II.     JURISDICTION AND VENUE

6.  The jurisdiction of the Court is predicated on the existence of a federal question jurisdiction pursuant to the provisions of 28 U.S.C. § 1331, as there are claims and allegations predicated on EMTALA, 42 U.S.C. §1395dd.

7.   The Honorable Court also has supplemental jurisdiction over the general tort claims filed against the co-defendants pursuant to the provisions of 28 U.S.C. § 1367.

8.   Pursuant to 28 U.S.C. § 1391 (b)(2) and 42 U.S.C. §1395dd, venue is proper in this Honorable Court, as the covered hospital for EMTALA purposes is located within this District.

9.   For the present cause of action, upon request, Plaintiffs received decedent's medical records on 7/18/2023, for which statute of limitation starts since.

### III.    THE PARTIES

10.    Co-plaintiff Mrs. Idalis Landrau Fragoso ("Idalis"), is of legal age, and daughter of decedent-victim Mrs. Fragoso and domiciled in Carolina, Puerto Rico. Furthermore, she is heir to the legal cause of action of Mrs. Fragoso.

11.    Co-plaintiff Mrs. Ivonne Landrau Fragoso ("Ivonne"), is of legal age, and daughter of decedent-victim Mrs. Fragoso and domiciled in Canovanas, Puerto Rico. Furthermore, she is heir to the legal cause of action of Mrs. Fragoso.

12.    Co-plaintiff Mrs. Giselle Landrau Fragoso ("Giselle"), is of legal age, and daughter of decedent-victim Mrs. Fragoso and domiciled in Gurabo, Puerto Rico. Furthermore, she is heir to the legal cause of action of Mrs. Fragoso.

13.    Co-plaintiff Mr. German Landrau Fragoso ("German"), is of legal age, and son of decedent-victim Mrs. Fragoso and domiciled in Juncos, Puerto Rico. Furthermore, she is heir to the legal cause of action of Mrs. Fragoso.

14.    Plaintiffs inherited the causes of action of plaintiff victim-decedent Mrs. Fragoso who domiciled in Puerto Rico before her death.

15.    Co-Defendant HOSPITAL PAVÍA DE SANTURCE, INC. (PAVIA SANTURCE) is an entity or corporation organized and existing under the laws of the Commonwealth of

Puerto Rico, with principal place of business in San Juan, Puerto Rico, and in charge or control of the medical facility where Decedent Mrs. Fragoso was treated, with its principal place of business in this jurisdiction.

16.     Co-Defendant EMERGENCY PHYSICIAN PROVIDERS, LLC (EPP and/or EMERGENCY PHYSICIAN), is an entity or corporation organized and existing under the laws of the Commonwealth of Puerto Rico, with principal place of business in San Juan, Puerto Rico. It's responsible and liable for its own negligence or that incurred by its medical staff, whose actions or omissions caused harm to Mrs. Fragoso and to Plaintiffs.

17.     MEDRO aka MEDRO GROUP and/or Medical Protective (hereinafter "Medro") is an insurance company with headquarters in the State of Indiana. At all relevant times herein, Medpro had in full force and effect an insurance policy covering the legal liability of Hospital Pavia Santurce for the damages claimed herein.

18.     Co-Defendant, DR. MOISES O. RAMIREZ-VEGA (hereinafter "Dr. Ramirez"), is the emergency doctor that worked at the medical facility that treated Decedent and who was co-responsible for malpractice and whose acts and omissions were the cause of Decedent's death and thus, of plaintiffs' damages. upon information and belief, a resident and citizen of Puerto Rico, with last known address in Ponce, P.R. He is sued individually, and as a member of the conjugal partnership formed by him and his wife, Jane Doe. Defendant is jointly and severally liable to plaintiff for the acts alleged herein.

19.     Co-Defendant DR. FELIX M. GONZALEZ-SANTIAGO (hereinafter "Dr. Gonzalez"), his wife Jane Doe 2 and the conjugal partnership DFG composed by them; is the ON CALL emergency doctor that worked at the medical facility and did not assist and/or treated Decedent and who was co-responsible for malpractice and whose acts and omissions were the cause of Decedent's death and thus, of plaintiffs' damages. upon

information and belief, a resident and citizen of Puerto Rico, with last known address is unknown. He is sued individually, and as a member of the conjugal partnership formed by him and his wife, Jane Doe 2. Defendant is jointly and severally liable to plaintiff for the acts alleged herein.

20.     PUERTO RICO MEDICAL DEFENSE (hereinafter "PRMD") is an insurance company that, upon information and belief, and at any time pertinent to the facts alleged in the complaint had in full force and effect an insurance policy providing without limitation coverage to the negligent acts of Dr. Ramírez, Dr. Gonzalez, and Emergency Physicians, and or of any other unknown physician and/or medical providers that had caused damages to plaintiffs.

21.     SINDICATO DE ASEGURADORES PARA LA SUSCRIPCIÓN CONJUNTA DE SEGURO DE RESPONSABILIDAD PROFESIONAL MÉDICO-HOSPITALARIA (SIMED) is an insurance company that, upon information and belief, and at any time pertinent to the facts alleged in the complaint had in full force and effect an insurance policy providing coverage to the negligent acts of one of the codefendants and/or unknown tortfeasors that had caused damages to plaintiffs, including without limitation Dr. Ramírez, Dr. Gonzalez, Pavia Santurce, and Emergency Physicians.

22.     NATIONAL FIRE AND MARINE INSURANCE COMPANY (NATIONAL FIRE) is an insurance company that, upon information and belief, and at any time pertinent to the facts alleged in the complaint had in full force and effect an insurance policy providing coverage to the negligent acts of one of the codefendants and/or unknown tortfeasors that had caused damages to plaintiffs, including without limitation Emergency Physicians.

23.     Defendant Jane Doe is the spouse of codefendant Dr. Moises Ramirez, who forms a conjugal partnership with him and who is liable for her husband's acts and

omissions. Co-Defendant is designated with a fictitious name because its correct name is unknown at the present.

24.    Defendant Jane Doe 2 is the spouse of codefendant Dr. Gonzalez, who forms a conjugal partnership with him and who is liable for her husband's acts and omissions. Co-Defendant is designated with a fictitious name because its correct name is unknown at the present.

25.    Conjugal Partnership ABC is the unknown marital regime between  Dr. Moises Ramirez and Jane Doe, who is liable for the acts and omissions of Dr. Moises Ramirez. Defendant is designated with a fictitious name because its correct name is unknown at the present.

26.    Conjugal Partnership DFG is the unknown marital regime between    Dr. Gonzalez and Jane Doe 2, who is liable for the acts and omissions of Dr. Gonzalez. Defendant is designated with a fictitious name because its correct name is unknown at the present.

27.    Co-defendant Continental Casualty Company ("Continental") by information and belief is an insurance company organized pursuant to the laws of the Commonwealth of Puerto Rico who at all material times alleged herein, was the primary and/or excess liability insurer of the Hospital, had issued and in force one or more policies insuring the claims referred to herein and is directly liable to the plaintiffs for the damages claimed.

28.    Unknown Corporations X, Y & Z ("Corporations X, Y & Z"), whose names are currently unknown to the Family, are legal entities organized under the laws of the Commonwealth of Puerto Rico that employed the employees, agents, administrators, owners, directors and/or subcontractors who negligently provided the medical treatment that caused Mrs. Fragoso's death, and who are directly liable to plaintiffs for their negligent

acts and/or omissions and/or who are vicariously liable to Plaintiffs for the negligent act and/or omissions of the co-defendants and/or third parties who have yet to be identified

29.     Codefendant, ABC Corp. is by information and/or belief the entity who operated or managed the emergency services of the medical entity that treated Decedent-Patient. Defendant is designated with a fictitious name because its correct name is unknown at the present.

30.     Defendant, JOHN DOE is a physician and/or medical provider of legal age, married, and a resident of the Commonwealth of Puerto Rico. He and his spouse JANE DOE 3 comprise a conjugal partnership. Information regarding address and telephone number are currently unknown. The name JOHN DOE shall be duly substituted as discovery begins. JOHN DOE is liable for his negligent actions or omissions, which constitute medical malpractice, and resulted in damages to Plaintiffs. Negligent actions or omissions were conducted as part of his commercial and professional activity, which is presumed to be made for the benefit of the conjugal partnership between the two. Defendant is designated with a fictitious name because its correct name is unknown at the present.

31.     Defendant Jane Doe 3 is the spouse of codefendant JOHN DOE, who forms a conjugal partnership with him and who is liable for her husband's acts and omissions. Co-Defendant is designated with a fictitious name because its correct name is unknown at the present.

32.     A, B AND C Insurance Companies are insurance companies organized and existing under the laws of Puerto Rico, with its principal place of business in this jurisdiction. At all relevant times herein, which had in full force and effect an insurance policy covering the legal liability of one of the defendants for the damages claimed herein.

These Insurance Companies are designated with a fictitious name because its correct name is unknown at present.

33.    X,Y and Z Insurance Companies  whose names are currently unknown to the Plaintiffs, is/are insurers organized pursuant to the laws of the Commonwealth of Puerto Rico, which at all material times alleged herein, were the primary and/or excess liability insurers, respectively, of the any/all of the above co-defendants, including any of the known or unknown defendants, and had issued and in force one or more policies insuring some or all of the defendants for the claims referred to herein. Those insurance policies provide coverage for the damages claimed in this suit.

34.    UNKNOWN INDIVIDULAS A, B and C are physician(s) and/or medical provider(s) of legal age, with unknown civil status that could be married, and a resident of the Commonwealth of Puerto Rico. They are sued individually and as a member of the conjugal partnership formed by UNKNOWN INDIVIDUALS A, B, C individually and their wives, Jane Doe 4, Jane Doe 5, and Jane Doe 6. They and their unknown spouses comprise a conjugal partnership. Information regarding address and telephone number are currently unknown. The name of UNKNOWN INDIVIDUALS A, B and C shall be duly substituted as discovery begins. UNKNOWND INDIVIDUALS A, B, and C are liable for his negligent actions or omissions, which constitute medical malpractice, and resulted in damages to Plaintiffs. Negligent actions or omissions were conducted as part of his commercial and professional activity, which is presumed to be made for the benefit of the conjugal partnerships between the two. Defendants are designated with a fictitious name because their correct names are unknown at the present.

35.    Defendant Jane Doe 4 to Jane Doe 5 are the spouses of codefendant UNKNDOWN INDIVIDUALS A, B and C, who form a conjugal partnership with them and

who are liable for her/their husband's acts and omissions. Co-Defendants are designated with a fictitious name because its correct name is unknown at the present.

36.    All of the named defendants and/or Defendant collectively named are jointly and severally liable to the Plaintiffs for the damages claim in this case.

## IV.    FACTUAL ALLEGATIONS COMMON TO ALL DEFENDANTS AND TO ALL CAUSE OF ACTIONS

### Mrs. Fragoso goes to the Emergency Room

37. Plaintiffs incorporate each allegation set forth above in the precedents paragraphs as if fully set forth herein in their entirety.

38. On March 14, 2023, at 1:35 p.m., Mrs. Fragoso had an angioplasty on the right leg. The operation was successfully done, and Mrs. Fragoso was discharged home in a stable and satisfactory condition.

39. On March 15, 2023, at 2:06 p.m., Mrs. Fragoso was taken by ambulance to the emergency room of Hospital Pavia in Santurce, P.R., accompanied by German and Ivonne**.** The paramedics recorded hematemesis (bloody vomiting). Furthermore, on the physical examination, Mrs. Fragoso's abdomen had tenderness and the impression diagnosis was abdominal pain.

40. On or about 3:00 p.m., Mrs. Fragoso was received at the Pavia Hospital's emergency department in Santurce, by the Triage nurse, with vital signs compatible with a state of hypovolemic shock. The state of shock should be hypovolemia secondary to an internal bleeding.

41. Triage evaluation showed that Mrs. Fragoso had a serious life-threatening condition requiring immediate medical intervention.

42. Instead, at the hospital, Mrs. Fragoso was left unattended by the hospital's personnel on her stretcher in the hallway.

43. As the time elapsed without any physician taking care of Mrs. Fragoso, Idalis, Giselle, Ivonne and German were in despair and agony, as she noticed the extreme pain that Mrs. Fragoso was experiencing without relief and/or medical treatment.

44.   Rather than admitting Mrs. Fragoso for inpatient care, treating her or transferring her to another facility, the Hospital's personnel left her waiting, in crushing pain, at the emergency room for approximately four (4) hours.

45. During that time, Mrs. Fragoso received no medical evaluation or treatment.

46.   No screening was performed at the Hospital's emergency room — personnel there did not even bother to administer any medications, ancillary tests or perform a basic medical screening for Mrs. Fragoso.

47.   On or about 7:17 p.m., Mrs. Fragoso was evaluated by the emergency physician, Dr. Ramirez, who recorded the history of present illness as 87-year-old female vomiting dark and pain on the left leg (should be the right one) in the place of the angioplasty done the day before.

48.   Dr. Ramirez neither recorded his impression diagnosis after completing his evaluation of Mrs. Fragoso.

49.   On or about 8:14 P.M. Dr. Ramirez ordered ordinary laboratory test, including electrocardiogram, a chest plate, and both legs Doppler ultrasound image study. He also ordered intravenous fluids NSS at a rate of 80 ml/hour which were administered on the right hand, antacids and morphine.

50.   Upon information and belief, Defendants, John Doe, Richard Roe, UNKNOWN INDIVIDUALS A,B and C, were also on duty at the Hospital's emergency room at the time of Mrs. Fragoso's arrival and/or oversaw the personnel responsible to provide medical care but failed to evaluate and/or treat her.

51. At 8:36 p.m., panic values were notified to Dr. Ramirez indicating low hemoglobin levels. Shortly thereafter, Dr. Ramirez ordered blood crossmatch for transfusion.

52. The Hospital had available both the facilities and the medical personnel to provide the specialized medical intervention needed to save Mrs. Fragoso's life. But neither was deployed to do so.

53. On or about 8:51 pm the Hospital took Mrs. Fragoso to a cubicle.

54. Later, the hospital nurse recorded that the patient was alert and oriented waiting to be transfused, a Foley catheter was inserted, and a peripheral vein was canalized on the right forearm as a heparin lock. Supplemental oxygen was given and Mrs. Fragoso was connected to a cardiac monitor.

55. On or about 9:02 p.m., Dr. Ramirez was again notified about another panic value of carbon dioxide ($CO_2$). As the nurses note, Dr. Ramirez did not modify the current treatment.

56. On or about 9:30 p.m., Dr. Ramirez recorded a progress note indicating that the hemoglobin level of the patient was 5.9 g/dL, compatible with symptomatic anemia, would be transfused and Dr. Dominguez was notified through a consultation.

57. At 11:00 p.m., the hospital nurse recorded that she called the Blood Bank to know the status of the blood but was not ready yet. At 11:23 p.m., Dr. Ramirez obtained the blood transfusion permission. At 11:40 p.m., another call to the Blood Bank was made and they replied that the blood crossmatch required another forty (40) minutes to be done. They were advised that the blood was needed as soon as possible.

58. At 11:45 p.m., the same nurse recorded that she increased the oxygen volume as the patient showed shortness of breath and was observed diaphoretic. At 11:50 p.m., another call to the Blood Bank was made and they replied that the blood was ready.

59. On or about 12:04 AM Ivonne went to the counter to ask about the status of the blood transfusion since it was pending. Shortly thereafter, the nurse on duty told Ivonne that there were about thirty minutes left until the transfusion could be performed because they were working on the order that according to the nurse, and they were giving priority.

60. Shortly thereafter, Mrs. Fragoso began to scream desperately, and Ivonne noticed that Mrs. Fragoso breathing was being affected.

61. Once again, in disdain and desperation Ivonne went back to the counter to ask about the transfusion but when it was performed Mrs. Fragoso barely responded.

62. On March 16, 2023, at 12:00 a.m., Mrs. Fragoso's vital signs were recorded. At 12:30 p.m., the same nurse recorded that she got the blood and prepared the transfusion.

63. On or about 12:35 a.m., the nurse observed Mrs. Fragoso with gasping pattern respirations and called a green code. She also called Dr. Ricardo J. Castro-Cintron and began advance cardiopulmonary resuscitation measures. The blood transfusion was stopped but at 12:39 a.m., was resumed.

64. Later, Ivonne consulted the emergency doctor who passed by the hallway, and she was informed that Mrs. Fragoso had no pulse.

65. On or about 5:29 P.M. of March 17, 2023, the anesthesiologist, Dr. David A. Castrodad-Justiniano, recorded that at 12:50 a.m., Mrs. Fragoso was evaluated by him because of cardiac arrest, which required assisted ventilation and intubated the patient. By that time, she developed a cardiac arrest and when he arrived, she was undergoing CPR.

66. He recommended doing arterial blood gases and a chest radiograph to verify the position of the endotracheal tube. The patient's demise was recorded at 1:00 a.m.

67. Surprisingly, on March 20, 2023, Dr. Ramirez recorded the Death Certificate and the immediate cause of death as an acute cardiorespiratory failure.

68. Dr. Ramirez certified Mrs. Fragoso's death in contradiction to the instructions provided by the Puerto Rico Department of Health regarding the way a Death Certificate must by recorded, and in no compliance with the American College of Pathologist Guidelines.

69. On March 21, 2023, an autopsy was done by the pathologist, Dr. Edda Rodriguez Morales, who determined the sequence of death events as an acute coronary syndrome secondary to gastrointestinal bleeding as a mesenteric ischemia. As the autopsy report, there was upper gastrointestinal bleeding as coffee ground material found in the stomach and melena. There was also an obstruction of the left anterior descending coronary artery of 95%.

## V.    EMTALA CAUSE OF ACTION

74.    Plaintiffs incorporate each allegation set forth above in the precedents paragraphs as if fully set forth herein in their entirety.

70.    Defendants were negligent and violated EMTALA statutes when failed to screen Mrs. Fragoso in the emergency room.

71.    Congress enacted EMTALA intending "that all patients be treated fairly when they arrive in the emergency department of a participating hospital and that all patients who need some treatment will get a first response at minimum and will not simply be turned away." Reynolds v. Maine General Health, 84 218 F.3d 78 (1st Cir.2000), citing Baber v. Hospital Corp. of America, 977 F.2d 872, 880 (4th Cir.1992).

72.    EMTALA provides a private cause of action against a covered hospital to redress all the damages suffered from a violation of its provisions. 42 U.S.C. §1395dd(d)(2)(A).

73.    As pertinent here, EMTALA sets forth core obligations that covered hospitals must satisfy.

74.     One of the EMTALA's core obligation mandates covered hospitals to provide a "proper screening examination" aimed at determining whether the person who requests emergency medical care presents an "emergency medical condition." §1395dd(a).

75.     *Subsection (a), entitled "Medical Screening Requirement," provides:*

> *In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this title), comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition exists.* 1395dd(a).

76.     Even though EMTALA does not specify what constitutes a "proper medical screening", the First Circuit has interpreted the term as calling for an examination "reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and [to] provide[] that level of screening uniformly to all those who present substantially similar complaints." Cruz– Vazquez v. Mennonite Gen. Hosp., Inc., 717 F.3d 63, 69 (1st Cir. 2013). This requirement is in place to ensure "that there be some screening procedure, and that it be administered even-handedly." Id.

77.     In turn, the term "emergency medical condition," as pertinent here, is defined by the statute as:

> a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in--(i) placing the health of the individual … in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part. §1395dd(e)(1).

78.     As long established by the First Circuit Court of Appeals, to prevail in an

EMTALA claim:

a plaintiff must show that (1) the hospital is a participating hospital, covered by EMTALA, that operates an emergency department (or an equivalent treatment facility); (2) the patient arrived at the facility seeking treatment; and (3) the hospital either (a) did not afford the patient an appropriate screening in order to determine if she had an

emergency medical condition, or (b) bade farewell to the patient (whether by turning her away, discharging her, or improvidently transferring her) without first stabilizing the emergency medical condition. Correa v. Hosp. San Francisco, 69 F.3d 1184, 1190 (1st Cir. 1995).

79. Pursuant Section §1395dd(d)(b)(1) If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either-

> (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

> (B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

80. PURSUANT EMTALA 42 U.S.C. §1395dd(d)(1)(C)

If, after an initial examination, a physician determines that the individual requires the services of a physician listed by the hospital on its list of on-call physicians (required to be maintained under section 1395cc(a)(1)(I) of this title) and notifies the on-call physician and the on-call physician fails or refuses to appear within a reasonable period of time, and the physician orders the transfer of the individual because the physician determines that without the services of the on-call physician the benefits of transfer outweigh the risks of transfer, the physician authorizing the transfer shall not be subject to a penalty under subparagraph (B). However, the previous sentence shall not apply to the hospital or to the on-call physician who failed or refused to appear. 42 U.S.C. §1395dd(d)(1)(C)

81. *In addition to EMTALA requiring on-call coverage, the hospital conditions of participation at 42 C.F.R. § 482.55, "Emergency Services", direct hospitals to staff their emergency departments adequately: "The hospital must meet the emergency needs of patients in accordance with acceptable standards of practice."*

*Subsection 482.55 (b)(2) further states: "There must be adequate medical and nursing personnel qualified in emergency care to meet the written emergency procedures and needs anticipated by the facility.*

82. *In addition, 42 C.F.R. § 482.22, "Medical Staff," requires: "The hospital must have an organized medical staff that operates under by-laws approved by the governing body and is responsible for the quality of medical care provided to patients by the hospital."*

## A. THE HOSPITAL VIOLATED EMTALA BY FAILING TO SCREEN MRS. FRAGOSO UPON HER ARRIVAL TO THE EMERGENCY ROOM.

83.    All the allegations stated above are incorporated by reference as if fully set forth and restated herein.

84.    On March 15, 2023, Mrs. Fragoso developed an upper gastrointestinal bleeding of such magnitude to produce tachycardia and later hypotension. By the time she arrived at Pavia Hospital in Santurce, she arrived in obvious hypovolemic hemorrhagic and decompensated shock.

85.    The Triage nurse unnoticed or ignored the abnormal vital signs that within the clinical context of bloody vomiting were compatible with a shock state and incorrectly categorized the case of Mrs. Fragoso.

86.    Almost four (4) hours later, Dr. Ramirez assisted the patient and neither noticed or ignored the abnormal vital signs that addressed an upper gastrointestinal bleeding because the recorded dark color vomiting, hematemesis, and unstable hemodynamics.

87.    This 4-hour delay in performing a medical screening exam of Mrs. Fragoso constitutes a violation of EMTALA.

88.    The Triage nurse failed to recognize that Mrs. Fragoso's vomiting episodes and the obtained vital signs required an immediate medical evaluation and notification to Dr. Ramirez.

89.    Furthermore, the nurse failed by categorizing Mrs. Fragoso as a "standard" (not urgent) patient and wrongfully disposed of Mrs. Fragoso in the waiting room.

90.    The nurse underestimated and failed to recognize the real emergency and failed to notify Dr. Ramirez immediately of Mrs. Fragoso's critical health condition.

91.    The Triage Nurse departure from the Hospital's protocol violated EMTALA's appropriate screening requirement.

92.    At all times herein, Dr. Ramirez must be aware of Mrs. Fragoso arrival and her condition upon arrival at the emergency department.

93.    By the time the paramedics leave a patient in the emergency department, they leave a copy of the ambulance binnacle that constitutes the last page of the emergency record.

94.    Dr. Ramirez should be aware about Mrs. Fragoso's hematemesis and that she was presenting hypotension and tachycardia at the time she arrived the emergency department.

95.    Furthermore, Dr. Ramirez failed to inquiry and get involved about the characteristics and volume of the bloody vomiting "coffee-ground".

96.    Dr. Ramirez also failed to notice that the recorded vital signs, within the context of bloody vomiting, were compatible with hemodynamic instability and a state of hypovolemic shock.

97.    To put it simply, Mrs. Fragoso never received a medical screening exam reasonably calculated to identify critical medical conditions that were afflicting her. In failing to screen Mrs. Fragoso, the Hospital's emergency room personnel, Dr. Ramirez, and the nurses fragrantly violated EMTALA.

98.    Absent a proper medical screening, no one at the Hospital determined that Mrs. Fragoso was suffering from a hypovolemic hemorrhagic and decompensated shock.

99.    Had a proper medical screening been conducted, physicians been consulted, hospital admission or transfer and further and proper treatment had been administered, Mrs. Fragoso would have survived.

100.   Mrs. Fragoso was denied access to the services available at the Hospital's emergency room and she died because of such denial and breach of following the standard medical care.

101.   Idalis, Ivonne, Giselle and German, and Mrs. Fragoso all suffered anguish and emotional distress in direct consequence of the Hospital's EMTALA violation inflicted upon Mrs. Fragoso which ends with Mrs. Fragoso's death.

**B. EMTALA VIOLATION BY NOT PROVIDING NECESARY STABILIZAING TREATMENT FOR A MEDICAL CONDITION**

75.   Plaintiffs incorporate each allegation set forth above in the precedents paragraphs as if fully set forth herein in their entirety.

76.   Dr. Ramirez failed to be aggressive in the infusion of the intravenous fluids, as did not provide appropriate supplemental oxygen administration, and delayed the consultation with the specialist in order to admit the patient to the ICU.

77.   By the time the hemoglobin panic values were reported, Dr. Ramirez did not hurry to amend his initial clinical management plan and the patient continued to bleed and continued to deteriorate.

78.   The hyperglycemia results were not managed by the Hospital's personnel and Dr. Rodriguez, and the IV fluid rate was never adjusted to the real condition of the patient, as the severe anemia precipitated an acute coronary syndrome that led to an irreversible cardiovascular collapse and Mrs. Fragoso's demise.

79.   Dr. Ramirez failed to immediately request an order to obtain two (2) peripheral IV lines to infuse intravenous fluids, replace the lost volemia and stabilize Mrs. Fragoso. Instead, Dr. Rodriguez just ordered a modest quantity of IV fluids of only 80 ml/hour, which does not represent either maintenance rates.

80.   Additionally, knowing the critical Mrs. Fragoso's blood level and scenario, Dr. Ramirez did not order to crossmatch for blood (PRBC), platelets and fresh frozen plasma (FFP), regardless of the result of the liver dependent coagulation profile (PT, PTT, and INR) of the patient.

81.    Dr. Ramirez ordered only four (4) units of PRBC instead of six (6) more and did not order apheresis (platelet concentrate), either FFP.

82.    Furthermore, Dr. Ramirez and the Hospital's personnel failed to identify and stabilize Mrs. Fragoso's bleeding and stop the source of her bleeding appropriately.

83.    In simple words, Mrs. Fragoso's medical conditions that were afflicting her were never stabilized. In failing to screen Mrs. Fragoso, the Hospital's emergency room personnel, Dr. Ramirez, and the nurses fragrantly violated EMTALA.

84.    Absent a proper stabilization Mrs. Fragoso sustained long period of pain, discomfort, bleeding "coffee brown", screams, agony and disdain, until her death.

85.    Mrs. Fragoso was denied access to the services available at the Hospital's emergency room and she died because of such denial and breach of following the standard medical care.

102.   Idalis, Ivonne, Giselle and German, all suffered anguish and emotional distress in direct consequence of the Hospital's EMTALA violation which end inflicted upon Mrs. Fragoso which ends with Mrs. Fragoso's death.

### C.  HOSPITAL PERSONNEL AND DR. RAMIREZ VIOLATED EMTALA BY FAILING TRANSFUSE AND/OR FAILING TO TRANSFER ON TIMELY BASIS MRS. FRAGOSO

86.  Plaintiffs incorporate each allegation set forth above in the precedents paragraphs as if fully set forth herein in their entirety.

87.  Approximately at 11:00 p.m., the hospital's nurse recorded that she called the Blood Bank to know the status of the blood but was not ready yet.

88.  Shortly thereafter, Dr. Ramirez obtained permission for a transfusion. At 11:40 p.m., the Blood Bank was called again, and they replied that the crossmatch required another forty (40) minutes to be completed. The nurse advised that the patient required the blood as soon as possible.

89. At 11:00 p.m., was not reasonable to wait any longer for the crossmatched blood. Dr. Ramirez must transfuse at least two (2) units of non-crossmatched blood to save his patient's life. Conversely, Dr. Ramirez consented the delay in delivery of the blood and limited his participation to obtaining the transfusion permit approximately at 11:23 p.m. Shortly thereafter, that patient entered an irreversible deterioration and died.

90. In sum, despite knowing the delays and prolonged time to assist Mrs. Fragoso with her medical conditions and symptoms that were afflicting her, she was never transferred for a medical facility that could take care of her immediately. In failing to screen Mrs. Fragoso, the Hospital's emergency room personnel, Dr. Ramirez, and the nurses fragrantly violated EMTALA.

91. By doing so, Mrs. Fragoso sustained long periods of pain, discomfort, bleeding "coffee brown", lack of fluids and breath, agony and disdain, until her death.

92. Mrs. Fragoso was denied access to the services available at other facilities other than the Hospital's emergency room and she died because of such denial and breach of following the standard medical care.

93. Idalis, Ivonne, Giselle and German, all suffered anguish and emotional distress in direct consequence of the Hospital's EMTALA violation inflicted upon Mrs. Fragoso which ends with Mrs. Fragoso's death.

### D. THE HOSPITAL PERSONAL, INCLUDING DR. FELIX M. GONZALEZ VIOLATED EMTALA AS HE AND THE GASTROENTEROLOGIST NEVER CAME TO BEDSIDE WITH MRS. FRAGOS

94. Plaintiffs incorporate each allegation set forth above in the precedents paragraphs as if fully set forth herein in their entirety.

95. Dr. Ramirez consulted the case to the internal medicine specialist approximately at 9:30 p.m. Regulation 117 from the Act 101 of the Puerto Rico Health Department,

states that a consultation placed in the emergency department, must be answered no more than thirty (30) minutes after being notified.

96.     Certainly, Dr. Felix M. Gonzalez-Santiago never came to the bedside of Mrs. Fragoso. If he had been come timely, he should notice the management errors, amend the clinical management plan, stabilize the emergency medical condition, and rescue Mrs. Fragoso from the imminent danger of dying exsanguinated.

97.     Dr. Gonzalez as on-call physician has obligation to take call, obligation to come to hospital, obligation to be timely, and hospital obligation to arrange for sufficient coverage, which the hospital's personnel neither Dr. Gonzalez did.

98.     Furthermore, the Hospital did not have a gastroenterologist on call and/or if he had not shown up to assist and treat Mrs. Fragoso.

99.     By failing with his duties and obligations to take call, and timely come to hospital, and hospital obligation to arrange for sufficient coverage, which the hospital's personnel neither Dr. Gonzalez did, Mrs. Fragoso sustained long periods of pain, discomfort, bleeding "coffee brown", lack of fluids and breath, agony and disdain, until her death.

100.    Mrs. Fragoso was denied access to the services available at other facilities other than the Hospital's emergency room and she died because of such denial and breach of following the standard medical care.

101.    Idalis, Ivonne, Giselle and German, and Mrs. Fragoso all suffered anguish and emotional distress in direct consequence of the Hospital's EMTALA violation inflicted upon Mrs. Fragoso which ends with Mrs. Fragoso's death.

## VI.    MEDICAL MALPRACTICE AND OTHER CAUSES OF ACTION PURSUANT ARTICLE 1536

74.     Plaintiffs incorporate each allegation set forth above in the precedents paragraphs as if fully set forth herein in their entirety.

75.     Pavia Santurce, Emergency Physician, Dr. Ramirez, Dr. Gonzalez, and/or another Defendant incurred in an egregious negligence in treating Mrs. Fragoso, knowing or should have known that her serious medical condition required extremely care measures, immediate and aggressive treatment, and constant monitoring.

76.     Article 1536 of the Puerto Rico Civil Code provides a general statute for tortious actions or omissions. P.R. Laws Ann. Tit. 31 § 10801. This article provides, in pertinent part, the following: "[a] person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done."

77.     According to the facts stated in this Complaint, Mrs. Fragoso suffered severe damages due to the lack of healthcare and/or inadequate and/or improper healthcare or lack of medical expertise of Defendants all of whom intervened– along with Pavia Santurce, Dr. Ramirez, Metro Pavia, Emergency Physician and/or other Defendant's healthcare staff.

78.     The faulty and negligent actions or omissions of Defendants, together with healthcare staff, caused Mrs. Fragoso's pain, agony, distress, and damages that included her death. Defendants, as well as healthcare staff or personnel who attended Mrs. Fragoso are all employed by Pavia Santurce, Emergency Physician and/or another Defendant. Therefore, Pavia Santurce, Metro Pavia, Emergency Physician and/or other Defendant are vicariously liable for all damages caused to Mrs. Fragoso because of the fault and/or negligence of its employees, contractors and/or services providers.

79.     Vicarious liability arises from Article 1540 of the Puerto Rico Civil Code, which provides, for the obligation to respond for acts of its employees or agents, the article states in its paragraph (e) that: "[o]wners or directors of an establishment or enterprise are likewise liable for any damages caused by their employees in the service of the

branches in which the latter are employed or on account of their duties." P.R. Laws Ann. Tit. 31 §10805.

80.     The Puerto Rico Supreme Court has established that the liability of employers for acts or omissions of its employees is, strictly speaking, vicarious, which means that employers are liable for the fault of others. They cannot be spared of their accountability by demonstrating that the employee was diligently selected, trained, and supervised by the employer.

81.     However, even if the Defendants prove, throughout the proceedings, that the health care providers are not employees of Pavia Santurce, Metro Pavia, Emergency Physician Providers, LLC, and/or other Defendant, the latter will still respond to plaintiffs, for the Puerto Rico Supreme Court has created other categories of vicarious liability in the context of healthcare service providers.

82.     Pursuant to Márquez Vega, *supra*, the Puerto Rico Supreme Court distinguished four categories of physicians for whose services the hospital—or physician granted a franchise—will be held liable. Writing for the Court, Justice Rebollo López states:

> Under the first alternative, that is, when a person goes directly to a hospital for medical treatment and the hospital "provides" the physicians who treat him, we favor the joint liability of hospital and private physician for the act of malpractice *(Omitted citation)*. Within this factual framework, we hold that it makes no difference whether the attending physician is a hospital employee or not, or a physician granted a "franchise" to offer his specialized medical services to the hospital patients, or a physician belonging to the hospital staff and called in for consultation to treat the patient, etc. *(Omitted citation)*. Marquez Vega v. Martinez Rosado, 116 D.P.R. 397 (1985).

The Puerto Rico Supreme Court reasoned that proceeding in this manner and holding the hospital liable was appropriate from a public policy perspective, for the patient entrusted the hospital with his or her health and went to that particular institution. To a

certain degree, the hospital is guaranteeing that said physician is competent and fit to render medical assistance. *Id.* at 497.

83.     Defendants, including Pavia Santurce, Metro Pavia, Emergency Providers, Dr. Ramirez, and other Defendants and/or Defendant including their insurers did not comport to the standards of the medical and healthcare profession in Puerto Rico. Thus, Pavia Santurce, Emergency Physician and/or other Defendant(s) are vicariously liable pursuant to Article 1541 of the Puerto Rico Civil Code, P.R. Laws Ann. Tit. 31 § 10805 Furthermore, Dr. Joe Doe, Dr. Jane Doe and /or Unnamed Defendants fall into one (of the four (categories the Puerto Rico Supreme Court established in Márquez Vega supra, for whose ac ts a hospital must be held accountable.

84.     As a medical institution, defendant Pavia Santurce and Emergency Provider had a non-delegable duty to provide quality medical services to anyone who arrived at its facilities seeking medical care and treatment. This duty was not discharged merely because the patient was received at the emergency room and was assigned a physician.

85.     Patient-Decedent arrived at Pavia Santurce emergency department on March 15, 2024, thereafter, hospital's personnel did not undertake efforts to expeditiously evaluate and treat the injuries of this elderly patient was suffering.

86.     Defendant Pavia Santurce failed to discharge its duty to provide quality medical services to decedent who arrived at its institution suffering from an emergency medical condition. As a medical institution, Pavia Santurce had the obligation to provide competent medical personnel and to properly supervise it.

87.     Defendants' handling of decedent was negligent and departed from the accepted professional standards of emergency room medical practice and did not provide decedent adequate medical assessment and defendant Hospital, and/or Pavia Santurce

are liable for decedent negligence vicariously and pursuant to Article 1540 of PR Civil Code 2020, (31 L.P.R.A. § 10805).

88.     An emergency physician evaluating a patient is obliged to obtain as much historical information as possible to explain a patient's symptoms or "chief complaint".

89.     The American College of Pathologists (ACP) dictates the standard of care about laboratory tests results management. A panic or critical value is defined as the result of a laboratory test of such abnormality that requires notification from the medical technologist to the head nurse or physician of the patient right away for an immediate corrective action.

90.     The physicians in charge of Mrs. Fragoso's health, Dr. Ramirez, the Hospital and the Hospital Staff, Emergency Providers, and/or Defendants failed to comply with the standard of care, applicable protocols, and ignored and unnoticed bloody vomiting that were compatible with a shock state and incorrectly categorized the case of Mrs. Fragoso.

91.     The physicians in charge of Mrs. Fragoso's health, Dr. Ramirez, the Hospital and the Hospital Staff, Emergency Providers, and/or Defendants failed to comply with the standard of care, applicable protocols, and let that a shock to continue its free and natural evolution and its consequences, the severe anemia precipitated an acute coronary syndrome that led to an irreversible cardiovascular collapse and Mrs. Fragoso's demise.

92.     The physicians in charge of Mrs. Fragoso's health, Dr. Ramirez, the Hospital and the Hospital Staff, Emergency Providers, and/or Defendants failed to comply with the standard of care, applicable protocols and almost four (4) hours later, Dr. Ramirez assisted Mrs. Fragoso and neither noticed or ignored the abnormal vital signs that addressed an upper gastrointestinal bleeding because the recorded dark color vomiting, hematemesis, and unstable hemodynamics.

93.     The actions and omissions of the Triage nurse and Dr. Ramirez deviated from the recognized principles that govern the best practice of emergency medicine, constituting the nexus of the fatal outcome of Mrs. Fragoso.

94.     Furthermore, the Emergency Medical Treatment and Active Labor Act, (EMTALA) and the Puerto Rico State Act 35 from 1994, which is identical to EMTALA in its provisions, both require that once a medical emergency is identified, must be stabilized within the standard of care guidelines. The Hospital, Emergency Providers, Dr. Ramirez, and any Defendant in charge of Mrs. Fragoso breach both Acts as they did not recognize the acute shock or stabilize it.

95.     Mrs. Fragoso's death was the result without limitation of the negligent and deficient medical treatment provided by all defendants. Defendants did not offer Mrs. Fragoso the appropriate medical attention, and she was not provided Triage, medical procedures, consultations and treatments that her condition required to receive an appropriate screening, diagnosis, stabilization and treatment.

96.     All defendants were negligent and failed to provide reasonable care to Mrs. Fragoso by not adequately screening, diagnosing, and treating without limitation the acute shock and later, the severe anemia precipitated an acute coronary syndrome that led to an irreversible cardiovascular collapse and Mrs. Fragoso's demise.

97.     Plaintiffs' damages were caused by the exclusive fault and/or negligence of defendants including, but without limitation, the following negligent acts and/or omissions:

     a.  failing to take an adequate, appropriate or complete patient history;

     b.  failing to provide an adequate, appropriate or complete patient physical exam;

     c.  failing to order indicated diagnostic tests to be completed in a timely manner;

d. failing to exercise appropriate medical decision making, based upon the presenting history and physical findings;

e. failing to provide indicated and appropriate patient treatment and doing so in a timely manner;

f. failing to consult the appropriate specialists in a timely manner or to insure the patient's evaluation on a "stat". basis;

g. failing to provide for proper ongoing patient care, evaluation and treatment;

h. failing to instruct the nursing staff in proper and sequential evaluation of the patient while she was in the emergency room;

i. failing to treat and stabilize the patient;

j. failing to read medical records;

k. failing to supervise the physician, nurses and training physicians under their control;

l. failing to make the proper medical decisions taking into consideration the patient's age and physical findings;

m. failing to comply with medical standards, rules and regulations related to patient medical care in the industry;

n. failing to provide adequate medical care to patient from the time of his arrival at the emergency room;

o. failing to hydrate victim-decedent.

98.    Failing to treat patient's symptoms, including, but not limited to his blood vomiting; internal bleeding "coffee brown"; shock and the severe anemia precipitated an

acute coronary syndrome that led to an irreversible cardiovascular collapse and Mrs. Fragoso's demise, while he remained at the emergency room.

99. Doctor Defendants' failure to provide an adequate treatment, and his otherwise negligent treatment of patient, was a proximate cause of the patient's death.

100.     Pursuant to Article 1536 of the Civil Code of Puerto Rico, 31 L.P.R.A. §10801 and Article 1163 (31 L.P.R.A § 9315), a person who by act or omission causes damage to another is liable for the damage so done. Defendants are liable to plaintiff because their negligence was a substantial contributing factor to patient's damages including her death and to the damages suffered by plaintiffs.

101.     By information and belief, at the time of the events that give rise to this case, defendants were either employees of Pavia Santurce and Emergency or had privileges to work there and failed to act and assisted the decedent pursuant the required standard of care during their services.

102.     By information and belief at the time of the events that give rise to this case, defendants were subcontractor and/or independent physicians of Pavia Santurce and Emergency or Defendants or had privileges to work there and failed to act and assisted the decedent pursuant the required standard of care during their services.

103.     Pavia Santurce and Emergency Providers Defendants are liable, either vicariously or by giving privilege, for the acts and omissions of the doctors, nurses and/or medical providers who worked there and gave treatment to Decedent.

104.     Furthermore, Defendants Dr. Ramirez, Jane Doe and the Conjugal Partnership ABC between them; Dr. Gonzalez, Jane Doe 2 and the Conjugal Partnership DEF between them; John Doe and Jane Doe 3 and the Conjugal Partnership between them; including Richard Roe, and ABC Corp.; X,Y and Z Corporations, and UKNOWN

INDIVIDUAS A, B and C, are liable either vicariously or by having privilege for the acts and omissions performed and the breach of the standard and reasonable duty of care.

105.      Defendants including but not limited to Pavia Santurce and Emergency Providers are liable, either vicariously or by giving privilege, for the acts and omissions of the nurses who worked there and gave treatment to Decedent.

106.   All  defendants  were  negligent  because  they  failed  to  consult  a gastroenterologist and if consulted, they failed by not performing an endoscopy and stopping Mrs. Fragoso bleeding. Not consulting and or nor performing the necessary test in these circumstances was a violation of the standard of care.

107.   All defendants were negligent by not adequately managing Mrs. Fragoso constant symptoms, not investigating her medical and family history, and not providing adequate follow up for the condition for which she was admitted.

108.   Pavia and Emergency Providers were negligent because they failed to provide medical supervision for the treatment of Mrs. Fragoso health conditions and to prevent possible and likely additional damages and the deterioration of Mrs. Fragoso's condition.

109.   Mrs. Fragoso died because of the failure of all herein defendants to screen, diagnose and treat her conditions, and to provide the necessary and appropriate care to stabilize the patient.

110.   Codefendants Pavia Santurce, Emergency Provider, Dr. Ramirez; his wife Jane Doe  and the conjugal partnership composed by them; PRMD; MEDPRO; NATIONAL FIRE; Dr.  Gonzalez his wife Jane Doe 2 and the conjugal partnership composed by them; JOHN DOE, his wife JANE DOE 3, and the conjugal partnership composed by them; RICHARD ROE; UNKNOWN INDIVIDUALS A, B and C, and their conjugal partnership composed by them; CONTINENTAL INSURANCE COMPANY; SIMED; A, B, and C Insurance  Company;  X,Y,  and  Z  Insurance  Companies;  ABC  Corp.;  X,Y  and  Z

Corporations, and its insurers are liable to plaintiff because of the failure of its medical, technician and nursing personnel to screen, diagnose and/or stabilize and/or treat and transfer a medical condition of which they were aware, and/or should have been aware. Therefore, by not stabilizing her conditions and not treating them accordingly to the medical practice they caused and/or contributed to her death.

111.   All Defendants incurred in gross negligence by failing to diagnose and treat Mrs. Fragoso medical conditions. They are liable to plaintiff in accordance with Article 1536 and 1549 of the Puerto Rico Civil Code, for they departed from the accepted standards of medical care and treatment recognized as adequate by the medical profession considering the modern means of instruction, education, and communication, and directly caused and/or contributed to plaintiff's damages.

112.   All co-defendants are jointly and severally liable under Article 1536 and 1540 of the Civil Code of Puerto Rico, and subject to punitive damages.

113.   All defendants who assisted, or should have assisted and/or treated Mrs. Fragoso, departed from the standard of care prescribed in the practice of medicine, and was the nexus of Mrs. Fragoso's damages, suffering and fatal outcome.

## VII.   DAMAGES

114.   Plaintiffs incorporate each allegation set forth above in the precedents paragraphs as if fully set forth herein in their entirety.

115.   Plaintiff repeats and realleges of the complaint as if set forth at length herein.

116.   Plaintiffs were very close to Decedent, living together and/or sharing a loving relationship, who suffered deeply their own individual mental damages as a result of the Death of Mrs. Fragoso.

117.   Defendants are responsible for plaintiffs' own damages as a result of the pain, agony, short of breath, continuous bleeding, and the severe anemia precipitated an acute

coronary syndrome that led to an irreversible cardiovascular collapse and Mrs. Fragoso's demise of Mrs. Fragoso.

118.     Mrs. Fragoso provided happiness to Idalis, Ivonne, Giselle and German. At the same time Landrau-Fragoso Family provided support and assistance to her mother in her daily live and activities.

119.     As a direct result of defendants' negligent acts and omissions and departure from good and accepted medical, hospital and nursing standards, Plaintiffs have suffered damages including, but not limited to, emotional distress, mental anguish, psychological damage of a permanent nature, persistent grief with post-traumatic features, loss of companionship and affection, loss of enjoyment of life, said damages being reasonably estimated at not less than Two Million Dollars ($2,000,000.00) for each plaintiff.

120.     As a direct result of defendants' negligent acts and omissions and departure from good and accepted medical, hospital and nursing standards, Mrs. Fragoso physical pain, and suffering, are estimated in no less than Three Million Dollars ($3,000,000.00), sum that is inherited by her survivors Idalis, Giselle, Ivonne and German (Plaintiffs).

121.     Special damages caused to Plaintiffs estimated in no less than TEN THOUSAND  DOLLARS ($10,000.00).

122.     Defendants are jointly and severally liable for these damages pursuant to Article 1536 of the Civil Code of Puerto Rico, 31 L.P.R.A. § 10801, and Article 1163 (31 L.P.R.A § 9315). During the days that preceded Mrs. Fragoso's death, Plaintiffs, Idalis, German, Ivonne and Giselle, consciously suffered excruciating pain, experienced deep and profound emotional distress and mental anguish due to Mrs. Fragoso's pain, suffering that ends upon her death at Hospital Pavia in Santurce. Plaintiffs saw their life slip away due to defendants' breach of standard medical care.

### VIII.     DIRECT CAUSE OF ACTION AGAINST INSURERS AND UNKNOWN TORTFEASORs' INSURERS

123.    Plaintiffs incorporate each allegation set forth above in the precedents paragraphs as if fully set forth herein in their entirety.

124.    Pursuant to Article 20.030 of the Puerto Rico Insurance Code, P.R. Laws Ann. Title. 26, 2003, Plaintiffs have a Direct cause of Action against the insurer of the malpractice tortfeasors unknown at this time and not named in this Complaint.

125.    At all-time herein, Defendants are liable either vicariously or by having privilege for the acts and omissions performed and the breach of the standard and reasonable duty of care and has an insurance policy that cover for their tortuous acts and omissions.

126.    At all times pertinent to this action, defendants A, B and C Insurance Companies had in full force and effect an insurance policy covering the legal liability of UNKNOWN TORTFEARS and /or defendants and/or Defendant for the acts and omissions claimed herein. Pursuant to the applicable law, A, B, and C Insurance Companies are jointly and severally liable with its insured, and doctors for their negligent acts and omissions.

127.    At all times pertinent to this action, A, B and C Insurance Companies had in full force and effect an insurance policy covering the legal liability of Hospital Municipal and /or defendants for the acts and omissions claimed herein. Pursuant to the applicable law, DEF Insurance Company is jointly and severally liable with its insured, and doctors for their negligent acts and omissions.

128.    At all times pertinent to this action, defendants X, Y, Z Insurance Companies had in full force and effect an insurance policy covering the legal liability of UNKNOWN TORTFEARS and /or defendants for the acts and omissions claimed herein. Pursuant to the applicable law, X, Y, Z Insurance Companies is jointly and severally liable with its insured, and doctors for their negligent acts and omissions.

129.    At all times pertinent to this action, SIMED had in full force and effect an insurance policy covering the legal liability of UNKNOWN TORTFEARS and /or defendants for the acts and omissions claimed herein. Pursuant to the applicable law, SIMED is jointly and severally liable with its insured, and doctors for their negligent acts and omissions.

130.    At all times pertinent to this action, PRMD had in full force and effect an insurance policy covering the legal liability of UNKNOWN TORTFEARS and /or defendants for the acts and omissions claimed herein. Pursuant to the applicable law, SIMED is jointly and severally liable with its insured, and doctors for their negligent acts and omissions.

131.    At all times pertinent to this action, MEDPRO had in full force and effect an insurance policy covering the legal liability of UNKNOWN TORTFEARS and /or defendants for the acts and omissions claimed herein. Pursuant to the applicable law, SIMED is jointly and severally liable with its insured, and doctors for their negligent acts and omissions.

132.    At all times pertinent to this action, NATIONAL FIRE AND MARINE INSURANCE COMPANY had in full force and effect an insurance policy covering the legal liability of UNKNOWN TORTFEARS and /or defendants for the acts and omissions claimed herein. Pursuant to the applicable law, SIMED is jointly and severally liable with its insured, and doctors for their negligent acts and omissions.

133.    At all times pertinent to this action, CNA and/or Continental Insurance had in full force and effect an insurance policy covering the legal liability of UNKNOWN TORTFEARS and /or defendants for the acts and omissions claimed herein. Pursuant to the applicable law, SIMED is jointly and severally liable with its insured, and doctors for their negligent acts and omissions.

## VIII. Jury Trial Demanded

134.    Plaintiffs incorporate each allegation set forth above in the precedents paragraphs as if fully set forth herein in their entirety.

135.    Plaintiffs hereby demand a trial by jury.

**WHEREFORE**, it is respectfully requested that this Honorable Court enters judgment in favor of plaintiffs and against defendants, jointly and severally, for the relief demanded in the complaint with imposition of attorneys' fees and costs.

**RESPECTFULLY SUBMITTED** this 12th day of March of 2024.

**Charles Gomez Law Office, LLC**

P.O. Box 1360
Trujillo Alto, P.R. 00977
Tel. (787)-662-0178
Fax. (787)-724-6780

s/ _Francisco Charles Gomez_

USDC-PR-303211
fcharleslaw@gmail.com